20099

Charles D. RAVENEL, Petitioner, v. Ben H. DEKLE et al., Respondents

(218 S. E. (2d) 521)

*Messrs. Belser, Belser, Baker, Barwick and Ms. Toal,* of Columbia, *for Petitioner.*

*Eugene Griffith, Esq.,* of *Blease, Griffith & Stone,* Newberry, *for Respondents Dekle and Dukes.*

September 26, 1975.

*Per Curiam:*

After hearing arguments in open court on September 23, 1974, we filed an order holding that Charles D. Ravenel was ineligible to serve as Governor of South Carolina, and an-

nounced that a full opinion would be filed in due course. Our opinion and the reasons for the order now follow:

The issue before the Court in this case was first raised in a class action commenced August 19, 1974, in the Court of Common Pleas for Greenwood County, entitled *"Ben· H. Dekle and Milton J. Dukes, in their own behalf individually and on behalf of all others similarly situated, Plaintiffs, vs. Charles D. Ravenel, Donald L.·Fowler, Chairman of the South Carolina Democratic Party, and G. P. Callison, Chairman of the South Carolina Election Commission, Defendants."* In that action the plaintiffs prayed that the (common pleas) "Court issue its injunction prohibiting the defendant, G.. P. Callison, from entering the name of Charles D. Ravenel upon the ballot in the next General Election in November, 1974, and for an Order restraining the defendant, Charles D. Ravenel, from further seeking the office of Governor until he ·is qualified under the Constitution ·of the State of South Carolina." ·

In ·that action the complaint alleged ·that Charles D. Ravenel "does not qualify for the office of Governor in that he has not been a citizen and resident of this State for a period of five years next preceding the date of election." It further alleged in essence that an action in the Court of Common Pleas for Richland County, commenced March 28, 1974, in which D. Frank McLane was the plaintiff, was a sham and invalid so far as adjudicating the eligibility of Charles D. Ravenel to serve as Governor was concerned. That action, wherein Charles D. Ravenel and Donald L. Fowler, Chairman of the South Carolina Democratic Party, were defendants, resulted in an order of the court of common pleas ruling that Ravenel was not ineligible to enter the Democratic primary.

On August 23, 1974, Ravenel, through his attorney, petitioned this Court to assume original jurisdiction of this action and to enjoin further proceedings in the Court of Common Pleas for Greenwood County. On the date 'of the

petition this Court issued its order assuming jurisdiction of the case and the issue involved. After the pleadings were filed, the Honorable J. B. Ness, at the direction of this Court, took the testimony and reported that testimony, along with the exhibits, to this Court without recommendation.

At a pretrial conference in this Court on September 6, 1974, with counsel for all parties present, it was stipulated that the action brought in the Court of Common Pleas for Richland County on March 28, 1974, although resulting in an order permitting Mr. Ravenel to enter the Democratic primary, was not binding and was not determinative of the issue involved in this action. All parties conceded that the order of the Richland County Circuit Court was not *res judicata,* and that Messrs. Dekle and Dukes were not estopped from asserting that Mr. Ravenel was ineligible.

Accordingly, the proceeding in this Court is *de novo.* The sole issue involved is:

Was Charles D. Ravenel a citizen and resident of the State of South Carolina for a period of five years next preceding the date of the General Election (November 5, 1974) within the meaning of Article IV, Section 2 of the Constitution of South Carolina?

In this proceeding the petitioner (Ravenel) is the moving party and has asked this Court to "declare that your Petitioner is not ineligible to serve as Governor of the State of South Carolina by reason of the Constitutional provision . . .." Respondent Donald L. Fowler, as Chairman of the Democratic Party, joins in petitioner's prayer for relief and takes the position that he is eligible.

G. P. Callison, as Chairman of the South Carolina State Election Commission, takes the position that he will place on the ballot the name of that person designated by the Democratic Party as nominee unless this Court directs otherwise, and requests "that the matter be adjudicated, and submits to the judgment of the Court.

Dekle and Dukes take a position *contra* to both Ravenel and Chairman Fowler, and, by way of counterclaim, pray for an injunction prohibiting G. P. Callison, as Chairman, from entering the name of Ravenel upon the ballot in the General Election and enjoining Ravenel from further seeking the office of Governor until he is qualified under the Constitution of the State of South Carolina.

Article IV, Section 2 of the Constitution of South Carolina reads in pertinent part as follows:

"Section 2. No person shall be eligible to the office of Governor who . . . shall not have been . . . a citizen and resident of this State for five years next preceding the day of election."

The evidence is not greatly, if at all, in conflict. Ravenel's evidence consisted of his own testimony, plus that of numerous witnesses, and the introduction of several exhibits. Chairman Fowler and Chairman Callison introduced no evidence. Dekle and Dukes presented no witnesses and relied upon the cross-examination of Ravenel's witnesses, and the introduction "of several exhibits".

## RAVENEL'S BIOGRAPHY

Ravenel was born in Charleston, South Carolina, on February 14, 1938. He resided in Charleston with his parents until he graduated from high school in 1956. He attended Phillips Exeter Academy in New Hampshire during the 1956-57 school year. In September, 1957 he entered Harvard College in Cambridge, Massachusetts, and graduated in 1961.

For one year thereafter, he was engaged in world-wide travel as a recipient of a Corning Glassworks Fellowship.

From September, 1962 until June, 1964, he was a student at the Harvard Business School.

Shortly thereafter, Ravenel was employed in New York City by an investment banking firm known as Donaldson,

Lufkin and Jenrette, where he worked until September, 1966. The employment was terminated when he accepted a White House Fellowship. He lived in Washington, D. C., until September of 1967.

At the conclusion of the White House Fellowship, Ravenel moved back to New York and was again employed by Donaldson, Lufkin and Jenrette. He remained in New York, working with this firm until March 20, 1972.

On this date he moved to Charleston, South Carolina, and opened a regional office for Donaldson, Lufkin and Jenrette. In June of 1973, he started his own investment banking firm, which business he continues to operate.

In the early part of 1974, Ravenel announced that he would seek the Democratic nomination for Governor. Shortly thereafter, the suit brought by McLane (referred to previously) was instituted. The order declared that Ravenel was not ineligible to enter the Democratic primary. This order was not appealed. In the ensuing Democratic primary on July 30, 1974, Ravenel received the highest number of votes.

It is the position of Ravenel that he has at all times since birth been a citizen and resident of South Carolina. He submits that his fifteen-and-one-half-years absence from September, 1956 until March 20, 1972, was of a temporary nature and for the purpose of attending school and procuring training desirable and necessary for the avocation which he intended to pursue, and in which he is now engaged in South Carolina. His position may be fairly summarized by his testimony as follows:

"I had a great interest in securing the best possible training that I could get in the field that I wanted to work in and that was finance and I went to the place where that training was the best, and that place was on Wall Street and I intended to go to Wall Street and work until I secured what I thought was complete training, never planning to maintain a permanent presence in New York City."

In support of this contention several of his witnesses testified that, at various times throughout the years since college, he had stated to them that he intended to return to South Carolina. No specific time for his return was ever indicated.

## DWELLING PLACES

In September, 1967 Ravenel bought a share in a cooperative, which is akin to, if not the equivalent of, purchasing a residence, in New York, and lived in the unit so procured until his interest was sold in February or March, 1972, just prior to his return to South Carolina.

In 1971 he bought from his parents a dwelling house in Charleston, into which he moved in March, 1972. On his income tax schedule relative to the sale or exchange of personal residence, he indicated that both the old and the new properties were used as his principal residence.

## VOTING RECORD

The Election Law for the State of New York sec. 150, relative to the qualification of voters, reads in relevant part as follows: "A qualified voter is a citizen who is or will be on the day of election twenty-one years of age, and who has been an inhabitant of the state for one year next preceding the election, and for the last four months a resident of the county, city or village and for the last thirty days a resident of the election district in which he or she offers his or her vote, . . ."

On May 16, 1968, Ravenel registered to vote in New York, and participated in elections there by voting on June 8, 1968, on June 17, 1969, on November 4, 1969, on November 3, 1970, and on November 2, 1971.

## INCOME TAX RETURNS

For the calendar years 1969, 1970 and 1971 Ravenel filed Federal Income Tax Returns listing a New York address; his New York State Income Tax returns asserted

that he was a resident of New York State; his New York City Income Tax Returns each asserted that both he and his wife were "New York City residents during the entire year." His returns for the year 1971 were not made until 1972 after his return to Charleston, with a new mailing address accordingly being indicated.

In 1973 he filed income tax returns for the calendar year 1972, with both New York authorities and the South Carolina Tax Commission. On these he certified that he was a resident of New York from January to March, 1972, and a resident of South Carolina from March, 1972, until the end of the year. In his South Carolina return, signed by him, he stated that he had not filed a South Carolina return for the year 1971 because he was not a legal resident of South Carolina during that year.[1]

If Ravenel were a South Carolina resident living in New York, as contended, he would have been required to file New York Tax Returns for the year 1969, 1970, and 1971. He would not have been required to file a return for 1972, since he did not stay in that state as many as 183 days during 1972. In addition, if Ravenel were a South Carolina resident living in New York, he would be required to file South Carolina Income Tax Returns for 1969, 1970, and 1971.

In 1973 he filed Federal and South Carolina State Income Tax Returns. He was unquestionably a resident of South Carolina for this whole year. On June 24, 1974, Ravenel filed late South Carolina returns as a resident of South Carolina for the years 1969, 1970, and 1971. He testified that these were filed after an audit, not inspired by him was made. A late filing penalty was assessed and paid for both 1969 and 1970. No taxes were paid to the South Carolina Tax Commission for these years because he was

---

[1] Income tax returns in South Carolina do not have to be sworn to but Section 65-802 provides, *inter alia,* that any person who shall knowingly make any false statement in an income tax return signed by him shall be guilty of a felony and punished as provided for perjury.

given credit for the state income tax he paid in New York. For 1971 he paid a late filing fee and paid $23.50 in taxes, due to the fact that the credit given him in New York was $23.50 less than the amount he would have paid in South Carolina had the tax been due here.

## CLUB MEMBERSHIP

While in New York Ravenel joined the Union Club and the City Mid-Day Club, taking a resident membership rather than a nonresident membership which was available. He also joined the Fairfield Country Club in Connecticut, taking a full membership and not a nonresident membership.

He registered his automobile in Connecticut, where he apparently spent considerable time on the weekends with relatives.

Birth certificates for his children show "Mother's Usual Residence" as being New York. They were baptized in Charleston.

A Charleston address is indicated on the following documents: Selective Service Registration (about 1956), application for membership in Huguenot Society (1961), a passport (1961), application for Harvard Business School (1961), and marriage license application (1963). Ravenel admits that, after the date of his marriage license, there is no other document in evidence to show that he claimed Charleston as a residence until November, 1971. At that time he applied for a passport giving Charleston as his residence.

In 1971 he flew to Boston to consider the advisability of accepting employment. He states that he declined to accept the job because of his desire to return to South Carolina. It is significant that his intent to return was not so fixed that he would decline to even consider the employment.

Ravenel states that during his years of absence he visited in South Carolina some four or five times each year.

In 1968 he procured an interest in and helped to develop a hotel in Charleston.

Ravenel testifies that his physical return to South Carolina was delayed because of a necessity to remain in New York to protect certain investments. He maintains that except for this fact and his desire to obtain additional practical training he would have moved back to Charleston earlier.

On September 12, 1972, Ravenel registered to vote in South Carolina. This was his first effort to participate in South Carolina election processes. On October 3, 1972, he procured a South Carolina driver's license.

The question in this case is the proper construction of the pertinent language of Article IV, section 2 of the South Carolina Constitution, or more specifically, the intent and meaning of the language "citizen and resident". There is no Federal constitutional issue involved in this proceeding, Ravenel having expressly refrained from raising any such. Basically his contention is that the evidence shows that his domicile was in South Carolina during the pertinent five year period and that such proof of domicile satisfies the constitutional requirement that he be "a citizen and resident" for the pertinent period. Stated otherwise, his contention is that the terms "resident" and "citizen" are synonymous and that the word "resident" in the Constitution requires only that he have been domiciled in South Carolina.

The parties are in agreement that for Ravenel to qualify he must be at least a domiciliary of South Carolina in order to be a citizen thereof. Respondents Dekle and Dukes contend that the words "citizen" and "resident", as used in the Constitution have separable meanings and that the word "resident" is used in the strict pri-

mary sense of one actually and physically living in the place for a time. With this latter contention we agree. As briefly stated in our order announcing our decision, the terms "citizen" and "resident", as used in the constitutional provision, are not synonymous and the constitutional provision requires as a condition of eligibility to the office of Governor that one must have been both a citizen and resident for the required time.

The constitutional requirement that a person be both a citizen and a resident, for a period of time, as a prerequisite to being eligible for the office of Governor had its origin in the Constitution of 1790.[2] Present Article IV, section 2 of the Constitution was adopted in the general election of 1972 and ratified in 1973. The pertinent language therein parallels the language of prior South Carolina Constitutions and is identical with that of the Constitution of 1895. Thus the meaning and intent of the terms "citizen" and "resident" as used in those earlier documents is highly persuasive, if not controlling. When the Constitution of 1895 was drafted it is clear that in judicial concept the terms "citizen" and "resident" were not the same. Nor did one necessarily include the other.

Shortly before the ratification of the Constitution of 1895, Justice McIver noted the distinction's existence when, in discussing a statutory requirement that non-resident plaintiffs give security for court costs, he wrote:

The provisions relate only to residence, and not to citizenship which are entirely different things. As was said by Mr. Justice Grier in *Parker v. Overman,* 18 How. 127

---

[2] S. C. Constitution Art. II, sec. 2 (1790) provided:
    Sec. 2. No person shall be eligible to the office of governor unless he * * * *hath resided* within this State *and been a citizen* thereof, ten years * * *
S. C. Constitution Art. III, sec. 3 (1868) provided:
    Sec. 3. No person shall be eligible to the office of governor who * * * at the time of such election * * * shall not have been a citizen of the United States and a *citizen* and *resident* of this State for two years next preceding the day of election. . . .

[137] 15 L. Ed. 318: "citizenship and residence are not synonymous terms." *Cummings v. Wingo,* 31 S. C. 427, 10 S. E. 107, 110 (1889).

The *Wingo* opinion clearly reflected substantial agreement in the contemporary legal community that "citizenship" and "residence" were separate and distinguishable. E. g., *Menarde v. Goggan,* 121 U. S. 253, 7 S. Ct. 873, 30 L. Ed. 914 (1887); *Grace v. American Ins. Co.,* 109 U. S. 278, 3 S. Ct. 207, 27 L. Ed. 932 (1883); *Robertson v. Cease,* 97 U. S. 646, 24 L. Ed. 1057 (1878); *Holt v. Tennallytown & R. Ry. Co.,* 81 Md. 219, 31 A. 809 (1895); *Robinson v. Oceanic Steam Nav. Co.,* 112 N. Y. 315, 19 N. E. 625, 2 L. R. A. 636 (1889). See generally, 10 *Cent. Dig., Constitutional Law,* secs. 625-648, at 2036-2070.

In the years intervening between 1895 and 1973 this Court has adhered to the distinction between the term "citizen" and the term "resident", holding that they do not mean the same thing. *LaTourette v. McMaster,* 104 S. C. 501, 89 S. E. 398 (1916), affirmed, 248 U. S. 465, 39 S. Ct. 160, 63 L. Ed. 362 (1919); *Tedars v. Savannah River Veneer Co.,* 202 S. C. 363, 25 S. E. (2d) 235 (1943). In view of the plain language of the Constitution and the long standing concept of the distinction between the terms "citizen" and "resident" we think it clear that the framers of the constitutional provision intended to require actual physical residence in the state rather than mere domicile as one of the prerequisites to be eligible for the office of Governor.

Demonstrative of the fact that the framers of the Constitution of 1895 were well aware of the distinction between the terms "citizen" and "resident" is the following fact. Article V, section 10 of the Constitution of 1868 provided, *inter alia,* that eligibility to become either a judge of this Court or of the circuit court was conditioned among other things, upon one having been "a resident of this State for five years next preceding his election," but did

not require, as a condition of eligibility, that one be a "citizen" of the state. Framers of the 1895 Constitution added the additional qualification of eligibility that one must also have been a "citizen" of this State for five years. Article V, section 10 (1895). Now Article V, section 11 (1973).

A cardinal rule as to the construction of constitutional provisions is, we think, well stated in 16 Am. Jur. (2d) 244, Constitutional Law, section 67, as follows:

"An elementary rule of a construction is that if possible, effect should be given to every part and every word of a constitution and that unless there is some clear reason to the contrary, no portion of the fundamental law should be treated as superfluous. A court should avoid a construction which renders any constitutional provision meaningless or inoperative, and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory."

South Carolina decisions are in accord with the stated rule. See cases collected in Wests' South Carolina Digest, Constitutional Law, Key 15, and Statutes, Key 206. The stated rule is applicable to the construction of statutes as well as constitutional provisions but is particularly applicable to the construction of constitutions and the various provisions thereof. Constitutions generally are most carefully prepared and the courts are bound to presume that the framers had some purpose in inserting every clause and every word contained in the document and it is never to be supposed that a single word was inserted in the organic law of the state without the intention of conveying thereby some meaning. See numerous cases cited in the footnotes to the text above quoted from 16 Am. Jur. (2d).

Citizenship in the first instance is founded upon actual residence and thereafter as long as one retains his residence even in a domiciliary sense, he

remains a citizen. If the framers of the particular constitutional provision meant to require nothing more than a domicile they could have stopped after using the word "citizen" and omitted the words "and resident". "Resident", in the domiciliary sense is embodied within the term "citizen". It follows therefore that if the words "and resident" be construed as meaning anything other than a requirement of actual physical residence such language would be surplusage. Accordingly the language permits of no other construction because we are not at liberty to treat any portion of the Constitution as surplusage. Admittedly Mr. Ravenel does not meet the requirement of actual residence in this State for the necessary five year period, and without more it conclusively follows that he is not eligible to be elected to the office of Governor.

The purpose of requiring actual residence is, we think, plain. By requiring a durational five year actual residency, the people have reserved to themselves the right to scrutinize the person who seeks to govern them. Obviously the people desired such a period to observe a gubernatorial candidate's conduct, to learn of his habits, his strengths, his weaknesses, his ideals, his abilities, his leanings, and his political philosophy—a period of time in which to consider, not only his words, but his acts and activities in community and public affairs. Correspondingly, they wanted a candidate to actually live in the state five years immediately preceding the election in order that he might become acquainted with the state's problems, its people, its industries, its finances, its institutions, its agencies, its laws and its Constitution, and become acquainted with other officials with whom he must work if he is to serve efficiently.

In *Chimento v. Stark,* 353 F. Supp. 1211 (N. H. D. 1973) affirmed, 414 U. S. 802, 94 S. Ct. 125, 38 L. Ed. (2d) 39, a three judge Federal court dealt with a seven year durational residency provision of the New Hampshire Constitution as a condition of eligibility to serve as

governor of that state. The opinion of the court points out that "29 states require five or more years, 10 states require seven or more years and two states require ten years" residency before one may serve as Governor. In commenting upon the purpose of such a requirement the court said "it ensures that the chief executive officer of New Hampshire is exposed to the problems, needs, and desires of the people whom he is to govern, and it also gives the people of New Hampshire a chance to observe him and gain firsthand knowledge about his habits and character."

Ravenel relies in part on Article I, section 6 of the State Constitution that provides, *inter alia*, "(t)emporary absence from the State shall not forfeit a residence once obtained." Even independent of this constitutional provision, temporary absences normally do not bring about a forfeiture of either citizenship or residency. Under the admitted facts, we do not think that this constitutional provision has any application in this case because we are not convinced that Ravenel's prolonged absence from the State could reasonably be held to be a temporary absence within the purview of the constitutional provision. If his contention in this respect and his further contention as to only domicile being required be held sound, it would follow that a native born citizen could leave the state and as long as he did not establish a domicile elsewhere, stay away for many years, and not return to the state until after his election as Governor, but still be eligible for such office. Such construction of the constitutional provisions would completely defeat the obvious purpose of the durational residency requirement for eligibility. Another elementary rule of construction is that no construction is permissible which will lead to an absurd result.

Even if we assume, as contended by Ravenel, that the word "resident" as used in the Constitution should be construed to only require that he have a

domicile for the prerequisite period of time he did not meet this test. As we have already held that the Constitution required him to be an actual resident, and not merely a domiciliary, we need deal only briefly with the law as to domicile. In *Gasque v. Gasque,* 246 S. C. 423, 143 S. E. (2d) 811 (1965) (a divorce case) our Court had occasion to define the word domicile as follows:

"And '(t)he term "domicile" means the place where a person has his true, fixed and permanent home and principal establishment, to which he has, whenever he is absent, an intention of returning.' "

Such is a generally accepted definition of the term. It is generally recognized, as we did in *Gasque,* that intent is a most important element in determining the domicile of any individual. It is also elementary, however, that any expressed intent on the part of a person must be evaluated in the light of his conduct which is either consistent or inconsistent with such expressed intent. Other elementary propositions which require no citation of authority are that a person can have only one domicile at a time; one maintains his prior domicile until he establishes or acquires a new one. A person may have more than one residence, but cannot have more than one domicile or be a citizen of more than one state at the same moment. Despite his sincere intention to return to his native state some day the overwhelming weight of the evidence is to the effect that in November, 1969, the beginning of the crucial period of time, Mr. Ravenel was an actual resident of, domiciled in and a citizen of the State of New York.

This opinion sets forth the basis of and reasons underlying our decision herein, announced by an order of this Court on September 23, 1974. Such order, of course, remains in full force and effect and no further judgment is required.